949 F.2d 1211
 137 L.R.R.M. (BNA) 2792, 60 USLW 2084,
119 Lab.Cas. P 10,831,
1991-2 Trade Cases P 69,565
 LIMBACH COMPANY, Appellant in 90-3639,
v.
SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, Sheet Metal
Workers International Association Local Union No. 12, Sheet
Metal Workers International Association, Local Union No. 17,
Sheet Metal Workers International Local Union No. 108, and
Edward J. Carlough, Sheet Metal Workers International
Association Local # 98.
LIMBACH COMPANY
v.
SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, AFL-CIO and
Sheet Metal Workers International Association,
Local Union No. 108, Appellants in 90-3606.
 Nos. 90-3639, 90-3606.
United States Court of Appeals,
Third Circuit.
 Argued April 9, 1991.
Decided July 9, 1991.
As Amended July 19, 1991.
Rehearing In Banc Granted in No. 90-3606, Opinion Vacated in
Part Aug. 26, 1991.*
 
 Robert A. King (argued), P. Jerome Richey, Buchanan Ingersoll, Professional Corp., Pittsburgh, Pa., for Limbach Co.
 Donald W. Fisher, Toledo, Ohio, Judith Rivlin, Washington, D.C., for Sheet Metal Workers' Intern. Ass'n, AFL-CIO.
 Michael Shelley, Wohlner, Kaplan, Phillips, Vogel, Shelley & Young, Encino, Cal., for Sheet Metal Workers' Intern. Ass'n, Local Union No. 108.
 Marsha S. Berzon, Laurence Gold (argued), Washington, D.C., of counsel with Sheet Metal Workers' Intern. Ass'n and Local Union No. 108.
 Ernest Orsatti, Jubelirer, Pass & Intrieri, P.C., Pittsburgh, Pa. for Sheet Metal Workers' Intern. Ass'n, Local Union No. 12.
 Paul F. Kelly, Segal, Roitman & Coleman, Boston, Mass., for Sheet Metal Workers' Intern. Ass'n, Local Union No. 17.
 Jerry A. Spicer, Snyder, Rakay & Spicer, Dayton, Ohio, for Sheet Metal Workers' Intern. Ass'n, Local Union No. 98.
 Before SLOVITER, Chief Judge, and GREENBERG and WISDOM,* Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 I.
 BACKGROUND
 
 1
 Limbach Company (Limbach) is a mechanical contracting company with principal offices in Pittsburgh, Pennsylvania, and additional offices in Woburn, Massachusetts (Boston), Compton, California (Los Angeles), Pontiac, Michigan (Detroit), and Columbus, Ohio.
 
 
 2
 Prior to the events underlying this case, Limbach was a union contractor and was a member of a multi-employer bargaining association in each of the metropolitan areas where it operates. The Pittsburgh, Detroit and Los Angeles offices were represented by the local chapters of the Sheet Metal and Air Conditioning Contractors National Association (SMACNA), while the Boston office was covered by the Sheet Metal and Air Conditioning Contractors Association of the Building Trades Employers Association (BTEA). Through its membership in these bargaining organizations, Limbach had a collective bargaining relationship with the sheet metal workers' union--Local No. 12 in Pittsburgh, Local No. 17 in Boston, Local No. 80 in Detroit, Local No. 98 in Columbus, and Local No. 108 in Los Angeles.
 
 
 3
 In 1982-83, Limbach was reorganized and became a wholly-owned subsidiary of Limbach Constructors, Inc. and, as part of this reorganization, Jovis Construction, Inc. was formed as a sister-company to Limbach Company. A purpose of the reorganization and the formation of Jovis was so that the Limbach organization could acquire nonunion operations in new geographic areas. Thus, in July 1983, Jovis purchased Harper Plumbing & Heating Company, Inc. in Florida. Harper had been a nonunion contractor for 30 years and, after its acquisition by Jovis, continued to be nonunion.
 
 
 4
 After Edward Carlough, the General President of the International Union, learned of this acquisition, he wrote a letter on August 10, 1983, to Walter Limbach, the president of Limbach until 1983, and the president of Limbach Constructors, Inc. from 1983 to 1988, stating:
 
 
 5
 I want to congratulate you on your company's takeover of Harper Plumbing and Heating in Orlando, Florida. We have been attempting to organize this contractor for a good number of years, and it was very thoughtful of you to have us organize this firm through your purchase of it.
 
 
 6
 App. at 2737.
 
 
 7
 The letter suggested a meeting between Lonnie Bassett, the International's Director of Organization, or Larry Cassidy, Carlough's assistant, to "consummate a labor agreement with your new shop." Walter Limbach gave this letter to Charles Prey, his successor as President of Limbach, who wrote to Carlough informing him that Limbach had not acquired Harper.
 
 
 8
 In October 1983, Cassidy and Walter Limbach met at Limbach's Pittsburgh office. Cassidy told Walter Limbach that Carlough expected Limbach to have Harper sign a collective bargaining agreement with a union affiliate and stated that the Harper nonunion operation violated existing collective bargaining agreements between Limbach and Locals 12, 17, 80, 98 and 108.
 
 
 9
 Walter Limbach disagreed with Cassidy's characterization of the situation, maintaining that Jovis, not Limbach, had acquired Harper, that Harper was a separate employer from Limbach and that Limbach had no authority over Harper labor relations matters. Cassidy told Walter Limbach that if Harper did not sign a labor agreement, contract violation grievances would be filed and if they did not result in Harper's unionizing, Limbach would face serious labor problems.
 
 
 10
 Carlough, Cassidy and Walter Limbach met on November 23, 1983, to discuss the Harper situation. Carlough asserted that Limbach was in violation of its local collective bargaining agreements by virtue of the Harper operation and he told Walter Limbach that the Union would file grievances alleging these violations. Walter Limbach maintained his position that Limbach and Harper were separate and that Limbach had no authority to sign a collective bargaining agreement on behalf of Harper. Carlough told Walter Limbach that if the situation were not resolved, the locals would disclaim interest in representing Limbach employees upon the expiration of their existing collective bargaining agreements.
 
 
 11
 The local unions filed grievances in the summer of 1984, alleging that Limbach was in violation of its collective bargaining agreements with them by virtue of its sister-relationship with Harper. The grievances of Locals 12, 17 and 108 ultimately came before the National Joint Adjustment Board for the Sheet Metal Industry (NJAB), the final decision maker under the collective bargaining agreements, a board composed of an equal number of union and employer representatives.
 
 
 12
 The unions' grievances alleged that the operation of Harper on a nonunion basis was a breach of the Standard Form of Union Agreement (SFUA), negotiated by the International Union and SMACNA. The agreement serves as a model for local collective bargaining agreements. It was the unions' belief that the SFUA prohibited double-breasting, meaning that a company owns both union and nonunion shops. Carlough believed he could force Harper to recognize the union through the grievance process by claiming that Limbach was in violation of its agreements through its affiliation with Harper. On February 8, 1985, the NJAB issued its decision on the grievances but, as it deadlocked, it did not find that Limbach had violated any of the SFUA provisions of its bargaining agreements. It did, however, find that the agreement between Limbach and Local 17 was not valid and binding and was of no force or effect.
 
 
 13
 Faced with the failure of the grievances against Limbach, Carlough met with the International Union's General Executive Council to develop an alternate method to combat double-breasting and this led to the development of the so-called "Integrity Clause."[1] The Integrity Clause obligated an employer to notify the union if it became affiliated through common ownership with a nonunion shop and gave local unions the power to rescind their labor agreements upon an employer's becoming so affiliated. In a letter dated March 22, 1985, Carlough instructed the local unions to have the Integrity Clause negotiated into their local agreements as soon as possible.
 
 
 14
 On April 14, 1985, the Executive Committee of SMACNA and some of its other personnel met in Washington, D.C. to consider the Integrity Clause and on the following day Carlough met with the Executive Committee in Washington. SMACNA was particularly concerned about the Integrity Clause and its meaning, as it had put the sheet metal industry, in the words of a SMACNA officer, "in an uproar" and SMACNA had received numerous inquiries about it. Carlough spoke to the Committee about the clause.
 
 
 15
 In an April 16, 1985, memo to Carlough, Russell Smith, SMACNA's Director of Labor Relations, referring to the meeting of April 15, stated in relevant part:
 
 
 16
 [i]t is our understanding that the following items were discussed and agreed upon at the above meeting:
 
 
 17
 1. That the 'Integrity Clause' is a permissive subject of collective bargaining.
 
 
 18
 * * * * * *
 
 
 19
 6. That local unions would not furnish union members to double-breasted union general contractors or others if union sheet metal contractors had been bidders on a job.
 
 
 20
 7. That SMWIA and its local unions would cooperate to see that union members would not work for non-union contractors and would not 'moonlight' to the detriment of union contractors.
 
 
 21
 App. at 2793-94. [Emphasis added].
 
 
 22
 At the same time, the International attempted to dissuade union members from working for double-breasting contractors, including Limbach, doing this with written appeals promoting union loyalty and changes in withdrawal card rights and pension benefits for members who continued working for companies affiliated with nonunion operations.
 
 
 23
 In the spring and summer of 1986, Locals 12, 17 and 108 did not renew the collective bargaining agreements as they expired and the locals issued disclaimers terminating their representation of Limbach employees.[2] Local 98 disclaimed the following year when its agreement expired. By June 1988, Limbach's operations were 100% nonunion.
 
 
 24
 The Integrity Clause was ultimately incorporated into a number of collective bargaining agreements. In the summer of 1986, Carlough spoke at the convention of Sheet Metal Workers' International Association. He said, in part:
 
 
 25
 ... Take this message back to Limbach. We are not in the business of getting rid of union contractors. We are in the business of organizing contractors.
 
 
 26
 * * * * * *
 
 
 27
 Limbach used to be with SMACNA years ago. You ought to understand the union thinking in the union man's mind. To me it's never too late. The door in this union is open.
 
 
 28
 If the man wants to come back and operate the right way I know both our people, both in Los Angeles and in Pittsburgh, and Walsh and the gang in Boston, if the man wants to straighten out the situation, who knows. He is a very smart fellow.
 
 
 29
 He wants to straighten the situation out. He will find out he is welcome back in this family. We want them union....
 
 
 30
 App. at 2858. [Emphasis added].
 
 II.
 PROCEDURAL HISTORY
 
 31
 On June 17, 1986, Limbach filed its complaint in the district court against the International Union, and Locals 12, 17 and 108, and on January 12, 1988, it filed an amended complaint joining Local 98 as a defendant. The complaint asserted unfair labor practice claims under section 303 of the Labor Management Relations Act, (LMRA), 29 U.S.C. § 187, which allows a damages action for violations of the secondary boycott provisions of section 8(b)(4) of the National Labor Relations Act, (NLRA), 29 U.S.C. § 158(b)(4) In addition, Limbach asserted antitrust claims under section 4 of the Clayton Act, 15 U.S.C. § 15.[3]
 
 
 32
 The case was bifurcated for trial between the liability and damages issues with the initial phase involving liability. At this phase, the jury was instructed on alternate theories of liability on the unfair labor practices claims. Thus, it was told that it could find an unfair labor practice based either on the unions' inducing Limbach employees to refuse to perform services in the course of their employment or on the unions' coercion of Limbach, by disclaiming representation of Limbach with the objective to force Harper to negotiate with the union or to have Limbach disassociate itself from Harper. On June 29, 1990, the jury returned three special verdicts on the liability issues under section 303. In Special Verdict No. 1 the jury found that Limbach and Harper were separate employers within the meaning of the NLRA, 29 U.S.C. § 151 et seq. In Special Verdict No. 2 the jury found that the International Union and each of the four affiliated local unions had committed an unfair labor practice under section 303. However, Special Verdict No. 2 did not reveal whether the jury's finding of an unfair labor practice was based on the unions' inducing Limbach employees to refuse to work, or whether it was based on the unions' coercion of Limbach. Special Verdict No. 3 asked:
 
 
 33
 Was the violation of Section 303 of the Labor Management Relations Act committed by any of the union defendants listed below a substantial factor in bringing about harm to plaintiff's business or property?In response the jury answered "yes" as to the International Union and Local 108 (Los Angeles) but "no" as to Locals 12, 17 and 98. The antitrust claim was not submitted to the jury as, on July 3, 1990, the district court granted the unions' motion for a directed verdict on those claims.
 
 
 34
 On July 9, 1990, the district court, in the light of Special Verdict No. 3, ruled that Limbach could present evidence of damages on the secondary boycott claim as to its Los Angeles operation but not as to those in Pittsburgh, Boston, and Columbus. On July 13, 1990, after the trial was resumed and additional testimony presented, the jury returned a special verdict on damages awarding Limbach $2,823,000 against the International Union and Local 108 on the secondary boycott claim. The district court thus entered judgment in favor of Limbach and against the International Union and Local 108 for $2,823,000, but it also entered judgment in favor of Locals 12, 17 and 98, against Limbach. On August 3, 1990, the court denied motions of Limbach, the International and Local 108 for judgments notwithstanding the verdict and, in addition, it denied a motion by Limbach for a new trial. The International Union, Local 108, and Limbach have filed timely appeals and we have jurisdiction under 28 U.S.C. § 1291.
 
 
 35
 We hold that the district court's order entering judgment against the International and Local 108 cannot stand, as the verdict may have been predicated on an impermissible basis. Accordingly, we will reverse and remand for a new trial on the issue of their liability under section 8(b)(4)(ii) of the secondary boycott provisions of the NLRA. We will affirm the district court's order entering judgment in favor of Locals 12, 17 and 98 on the secondary boycott claims, because we find that the jury's determination that Limbach suffered no damages in the applicable areas cannot be disturbed under the appropriate standard of review. Finally, we will affirm the district court's grant of the directed verdict against Limbach on its antitrust claims against the unions because we find that there is insufficient evidence in the record to support Limbach's claim of a conspiracy. On the remand the issue of whether Limbach and Harper are separate employers will not be retried.
 
 III.
 
 36
 APPEAL OF THE INTERNATIONAL UNION AND LOCAL 108
 
 
 37
 The appeal of the International Union and Local 108 (hereafter sometimes called the "unions" to the exclusion of the other locals) focuses on the alleged violations of the secondary boycott provisions of the NLRA. They argue that based on the charge the jury returned a general verdict on the secondary boycott violations founded on two independent grounds, so that we cannot ascertain which was the basis for the verdict. The unions then argue that, as a matter of law, there can be no secondary boycott violation for the disclaimer of the bargaining agreements with Limbach upon their natural expiration, regardless of their motives for the disclaimer. Accordingly, they contend that as the verdict might have rested on that disclaimer, it cannot stand. The unions further contend that they cannot be liable for the actions of the employees in refusing to work, as the employees simply lawfully quit their employment. Therefore, they contend that the verdict cannot stand as it may have been based on that conduct. The unions also contend that the district court erred in denying their motions for a directed verdict and judgment notwithstanding the verdict on the secondary boycott violations, urging that Limbach and Harper are not separate employers within the meaning of the NLRA. Of course, if they were not separate employers, there could be no secondary boycott.
 
 
 38
 We agree with the unions that the verdict was general and may have been based on the circumstance that they induced the employees to quit. This finding compels us to reverse the liability judgment against them because the secondary boycott provisions prohibit a union from inducing employees to refuse to perform services during the course of employment but do not preclude inducements to quit, as quitting is not a refusal to perform services during the course of employment. Under this court's jurisprudence, we must set aside a general verdict if it was based on two or more independent grounds one of which was insufficient, and we cannot determine whether the jury relied on the valid ground. Carden v. Westinghouse Elec. Co., 850 F.2d 996, 1000 (3d Cir.1988). Thus, regardless of our view of the other ground, we must reverse.
 
 
 39
 Nevertheless, we must also consider the unions' claim that the district court erred in denying their motions for a directed verdict and judgment notwithstanding the verdict on the alleged coercion of Limbach under section 8(b)(4)(ii), for if we agreed with the unions on this issue, no remand would be necessary as there would be no possible basis for secondary boycott liability. On this point we reject the unions' contention as we hold that the disclaimer scheme engaged in by the unions could be the basis for the finding of a secondary boycott violation under section 8(b)(4)(ii). Therefore, we will remand this case to the district court for a trial on the issue of whether the unions' actions violated the secondary boycott provisions of section 8(b)(4)(ii).
 
 
 40
 Finally, we consider and reject the unions' contention that the district court erred in denying their motions for a directed verdict and judgment notwithstanding the verdict on the grounds that Limbach and Harper are not separate employers within the meaning of the NLRA. Rather, we find that the jury's conclusion in Special Verdict No. 1, that Limbach and Harper are separate employers, is supported in the record and, therefore, the district court correctly denied the unions' motions grounded on this argument. Pursuant to Childers v. Joseph, 842 F.2d 689, 699 (3d Cir.1988), we find that the separate employer issue is distinct and separate and need not be an issue for the jury on the retrial. See also 6A Moore's Federal Practice p 59.06 (2d ed.1989). We find that there will be no injustice if the jury is informed that, for purposes of its determination of whether the unions violated section 8(b)(4)(ii), Limbach and Harper are separate employers.
 
 IV.
 STATUTORY FRAMEWORK
 
 41
 a. Section 8(f) Agreements in the Construction Industry
 
 
 42
 In general, under the NLRA an employer and a union can engage in collective bargaining only if a majority of the employees in the bargaining unit choose the union. See 29 U.S.C. § 159. However, section 8(f) of the NLRA contains an exception to this rule applicable to the construction industry which permits employers and unions to enter into voluntary section 8(f) collective bargaining agreements, commonly called "pre-hire agreements," without regard for the union's majority status.[4] 29 U.S.C. § 158(f). A pre-hire agreement is a contract between an employer and a union before the workers to be covered by the contract have been hired. See International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3 v. NLRB, 843 F.2d 770, 773 (3d Cir.), cert. denied, 488 U.S. 889, 109 S.Ct 222, 102 L.Ed.2d 213 (1988). Under section 8(f), employers and unions in the construction industry are permitted to enter into pre-hire agreements, designating the union as the exclusive representative of a company's employees without testing the unions' majority status. Iron Workers, 843 F.2d at 773. Since Limbach is involved in the construction industry, its agreements with the local unions were section 8(f) agreements.[5]
 
 
 43
 b. Secondary Boycott Restrictions
 
 
 44
 Section 303 of the LMRA, 29 U.S.C. § 187, creates a cause of action for damages for violations of section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4).[6] Section 8(b)(4) of the NLRA provides, in part:
 
 
 45
 [i]t shall be an unfair labor practice for a labor organization or its agents--
 
 
 46
 (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, material, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 
 
 47
 (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;
 
 
 48
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: ...
 
 
 49
 [Emphasis added].
 
 
 50
 Limbach's theory in its section 8(b)(4) claim against the unions was that their actions in encouraging Limbach employees to quit and in disclaiming their section 8(f) agreements with Limbach constituted coercion in violation of the secondary boycott provisions of section 8(b)(4)(i-ii), causing Limbach economic damages. According to Limbach, the unions' actions were intended to coerce Harper into bargaining with a non-certified union or, alternatively, to force Limbach, Limbach Constructors, Inc., Jovis and Harper to disassociate from each other.
 
 
 51
 Section 8(b)(4)(i-ii) of the NLRA prohibiting secondary boycotts by unions essentially prohibits union conduct having as an objective forcing a primary employer (the employer with which the union has a dispute) to bargain with a union or forcing a neutral employer (an employer with which the union has no dispute) to cease doing business with the primary employer. The proscribed methods used to achieve the objectives include inducing or encouraging employees of the secondary employer to strike or refuse to perform services in the course of employment and threatening, coercing, or restraining the secondary employer. See, e.g., Soft Drink Workers Union Local 812 v. NLRB, 657 F.2d 1252 (D.C.Cir.1980). Coercion can include economic pressure upon the neutral party. Allentown Racquetball & Health Club, Inc. v. Building and Constr. Trades Council of Lehigh and Northampton Counties, 525 F.Supp. 156 (E.D.Pa.1981). The purpose of the prohibition against secondary boycotts is to shield unoffending employers from pressures in disputes not their own, though preserving the rights of unions to bring pressure to bear on offending employers in primary labor disputes. Anderson v. International Bhd. of Elec. Workers, Local No. 712, AFL-CIO, 422 F.Supp. 1379 (W.D.Pa.1976).
 
 V.
 SECONDARY BOYCOTT
 
 52
 a. General Verdict
 
 
 53
 As we have indicated, the jury was instructed that it could find a section 303 violation on either of two grounds but we cannot determine which it used or whether it used both. First, the jury could have found that the unions induced or coerced Limbach employees to refuse to perform services in the course of their employment, in violation of section 8(b)(4)(i), or second, it could have found that the unions coerced Limbach itself via the disclaimers, in violation of section 8(b)(4)(ii). The unions claim that there is no evidence to show that they induced Limbach employees to do anything. Furthermore, the unions assert that section 8(b)(4)(i) covers only temporary work stoppages, and is inapplicable when employees quit, so that even if the union induced Limbach employees to quit, they could not have violated section 8(b)(4)(i).
 
 
 54
 We find that the jury could have determined that the unions did induce Limbach employees to quit their employ but that this inducement cannot constitute a violation of section 8(b)(4)(i) of the NLRA, as quitting is not a refusal to perform services within the course of employment as proscribed by that section.[7] Therefore, under Carden, 850 F.2d at 1000, the verdict cannot stand.
 
 
 55
 b. The Inducement Aspect of a section 8(b)(4)(i) Violation
 
 
 56
 At various times both before and after the disclaiming of the contracts with Limbach, Edward Carlough spoke to union employees or sent them written correspondence intended to convince them to leave Limbach upon the unions' disclaiming their representation, rather than remain as nonunion labor. In a May 1986 article in the Sheet Metal Workers Journal, entitled "Double Breasting--We Are Going to End It!", Carlough announced that some local SMWIA unions were disclaiming representation of Limbach employees based on Harper's nonunion status and appealed to employees to stop working for Limbach.
 
 
 57
 Carlough also sent a letter to local unions enclosing a "love note" for distribution to their membership to encourage them to walk off the job and these notes were in fact distributed. For example, the note sent by Carlough to Local 108, dated June 30, 1986, stated:
 
 
 58
 Today is the last day Sheet Metal Worker' Local Union 108 members will be working at Western Air. [Limbach's operating name in Los Angeles]
 
 
 59
 The company that owns Western Air also owns a non-union contractor. Employees for that company do the same work we do, but at substandard wages and conditions....
 
 
 60
 WE WON'T WORK FOR A DAMN CONTRACTOR THAT USES NON-UNION LABOR. WE'RE WALKING OFF TODAY TO MAKE SURE THERE WILL BE UNION JOBS TOMORROW.
 
 
 61
 App. at 2837.
 
 
 62
 The International took other steps to convince employees to stay loyal to the union and leave Limbach. Carlough suggested that the loss of certain pension benefits could be a "very useful weapon" in preventing union members from staying with Limbach after the disclaimers. Carlough announced that employees going nonunion would be subject to a loss of pension benefits.
 
 
 63
 Also in May 1986, Carlough announced a change in withdrawal card rights of union members. A withdrawal card allows members who have left the trade or joined management to return to the union without payment of an additional initiation fee. Pursuant to the change announced by Carlough, any member holding a card and found to be working for a nonunion contractor would forfeit his right to carry a SMWIA emblem and have his cards revoked. The purpose of this change was to "close one source of skilled sheet metal workers...."
 
 
 64
 In August 1986, the International amended its constitution to subject members to fines, suspension or expulsion for working for an employer who did not have a collective bargaining agreement with the union. One employee of Limbach in Columbus who remained working was fined $34,000 by Local 98.
 
 
 65
 We have no doubt that this conduct was intended to encourage and induce Limbach employees to quit working for Limbach and it clearly had that result. The words "induce or encourage" are broad enough to include every form of influence and persuasion. International Bhd. of Elec. Workers, Local 501 v. NLRB, 341 U.S. 694, 701-02, 71 S.Ct. 954, 958-59, 95 L.Ed. 1299 (1951). See also Local 370, United Ass'n of Journeyman and Apprentices, 157 N.L.R.B. 20, 26 (1966) (a reminder from a union representative that it is against the policy of all good union members to cross a picket line constituted unlawful inducement). Thus, the record supports a finding that the unions did induce Limbach employees to quit working for Limbach following the disclaimers.
 
 
 66
 c. Course of Employment Aspect of section 8(b)(4)(i)
 
 
 67
 The unions assert, however, that since the Limbach employees quit and did not go on strike, or refuse to do certain work while at Limbach, any conduct by the union did not induce or encourage them to refuse to work in the course of employment as required in section 8(b)(4)(i). The unions assert that the language of section 8(b)(4)(i) offers no support for the proposition that quitting constitutes a refusal to perform services in the course of employment within the meaning of the NLRA.
 
 
 68
 Conversely, Limbach argues that the unions did induce Limbach employees to refuse to perform work "in the course of [their] employment" by inducing them to quit. In this regard, Limbach admonishes that the purpose of the secondary boycott prohibition is to isolate neutral employers from conduct harmful to their businesses and the loss of an entire union work force clearly constitutes such harm. Finally, Limbach notes that Carlough at all times was prepared to take Limbach back into the union "family" if it succeeded in having Harper unionize. Thus, although the Limbach employees may have "quit," the International was always ready to have them go back to work for Limbach if it gave the unions what they wanted.
 
 
 69
 We find the unions' argument more persuasive. Section 8(b)(4)(i) first prohibits inducement to strike, which would inherently result in employees not working, but there is no dispute in this case that the actions taken by the Limbach employees did not constitute a strike. See, e.g., LTV Electrosystems, Inc. v. NLRB, 408 F.2d 1122, 1127 (4th Cir.1969) (individuals who permanently quit are not on strike). Section 8(b)(4)(i) also prohibits inducement of employees to refuse, in the course of their employment, to perform certain work. A reasonable, if not literal, interpretation of this language is that a union cannot lawfully induce employees to refuse to perform certain work while still employed, i.e., still on the payroll and not striking. We find that when Limbach employees quit they did not refuse to perform services within the course of their employment, as their employment was at an end. Thus, although the actions of the unions may have induced the employees to quit, such inducement cannot be the basis for a section 8(b)(4)(i) violation.[8] The consequence of our determination that the jury could not have found a violation of section 8(b)(4)(i) is that the verdict cannot stand. Carden, 850 F.2d at 1000.
 
 
 70
 d. The Unions' Disclaimer Scheme under section 8(b)(4)(ii)
 
 
 71
 The unions further assert that, as a matter of law, they cannot be liable for a secondary boycott violation under section 8(b)(4)(ii) because they merely repudiated their section 8(f) agreements upon their natural expiration. According to the unions, the lawfulness of a repudiation of a section 8(f) agreement upon its expiration is not dependent on the motive of the repudiating party.[9] We are, however, not persuaded by the unions' argument on this issue. Rather, we hold that the unions' actions in disclaiming their section 8(f) agreements could be the basis of a secondary boycott violation under section 8(b)(4)(ii).
 
 
 72
 The unions rely on the decision in John Deklewa & Sons, 282 N.L.R.B. 1375 (1987), enf'd sub nom., International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3 v. NLRB, 843 F.2d 770 (3d Cir.), cert. denied, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988), in support of their argument that they were free, as a matter of law, to disclaim their section 8(f) agreements with Limbach upon their natural expiration. Consequently, in their view, it follows that any proscribed secondary motive is irrelevant.
 
 
 73
 In Deklewa, the Board considered: (1) whether a section 8(f) agreement is unilaterally revocable during its term or is as binding during that term as any other union agreement and (2) whether, pursuant to section 8(a)(5), a section 8(f) agreement requires an employer to bargain with a union as the employees' exclusive representative after the expiration of the section 8(f) agreement. 282 N.L.R.B. at 1375.
 
 
 74
 The Board held that section 8(f) agreements are not unilaterally voidable, overturning its earlier ruling which held section 8(f) agreements voidable at will. Id. at 1377. The Board also held that upon the agreement's expiration the union would not enjoy a presumption of majority status, as under a section 9(a) agreement, and that the employer's obligation to bargain with the union, based on a section 8(f) agreement, expired with that agreement. Id. The union was proscribed from using coercive measures, including strikes and picketing, to compel negotiation and/or adoption of a successor agreement. Id. at 1386. This court upheld the Board's ruling as a reasonable interpretation of the NLRA. Iron Workers, 843 F.2d at 779-80.
 
 
 75
 The unions also rely on Yellowstone Plumbing, Inc., 286 N.L.R.B. 993 (1987). In Yellowstone, during a period in which a section 8(f) agreement was in effect between a plumbing contractor and a union, the employer unlawfully encouraged an effort to have the union decertified but that effort had not succeeded by the time the contract expired. Once the contract expired, the employer withdrew recognition, refused to bargain, and unilaterally changed the wages and working conditions of bargaining unit employees. General Counsel argued that the employer was precluded from repudiating the bargaining agreement, notwithstanding Deklewa, because the repudiation was tainted by bad faith. Id.
 
 
 76
 The Board rejected this argument, stating, "[a]lthough we agree that the [employer] unlawfully encouraged the decertification effort, misconduct does not warrant an exception to our policy under Deklewa." Id. at 993. The unions rely on Yellowstone for the proposition that "[m]otive ... is irrelevant under Deklewa principles." The unions claim that "the employer's nullification of the § 8(f) collective bargaining relationship is as effective and as unassailable when based upon motives otherwise impermissible under the statute as when undertaken for other reasons."
 
 
 77
 Similarly, the unions rely on Garman Construction Co., 287 N.L.R.B. 88 (1987), in which the Board reversed an administrative law judge's finding that an employer had violated section 8(a)(5) of the Act by refusing to recognize and bargain collectively with certain unions. In Garman, by the time the employer refused to bargain with the union, its section 8(f) agreement had expired. Thus, applying Deklewa, the Board found that the employer was not obligated to bargain with the union. Since the administrative law judge's conclusions regarding the violations turned on whether the employer had bargaining obligations to the union, the Board found the allegations had to be dismissed. Id. at 88-89.
 
 
 78
 The issue in this case differs from that in Deklewa. Here the issue is whether either party may repudiate the bargaining agreement where the object of the repudiation is one forbidden by the Act itself, an issue the Board clearly did not decide in Deklewa. The unions nonetheless rely on language in Deklewa to the effect that section 8(f) agreements are voluntary, pointing out that Deklewa indicated that "upon the expiration of [a Section 8(f) ] agreement ... either party may repudiate the 8(f) bargaining relationship." Deklewa, 282 N.L.R.B. at 1377-78. According to the unions, this principle is based on the fact that "Congress plainly mandated that 8(f) agreements be voluntary." Id. at 1381.
 
 
 79
 Despite the unions' effort to fit this case into the holding of Deklewa, that case simply does not address the issue before this court. In Deklewa, there were no allegations that the refusal to bargain was predicated on an improper motive. The issue before the Board in Deklewa was whether the section 8(f) agreement could be unilaterally repudiated during its existence. Simply stated, it assumed that there was no illegal objective to the repudiation other than the repudiation itself.
 
 
 80
 Further, the unions' argument as to the voluntary nature of the section 8(f) agreement is belied by the decision in Deklewa. The Board did state that section 8(f) agreements are voluntary but the Board further stated that, "it simply does not necessarily follow that because a section 8(f) agreement can only be entered into voluntarily either party to the agreement is unfettered in its right 'voluntarily' to repudiate the agreement." Id. In fact, it is this limitation which the Board effectuated in its holding that the employer could not unilaterally repudiate the section 8(f) agreement during its term.
 
 
 81
 Furthermore, the statement in Yellowstone that "misconduct does not warrant an exception to our policy under Deklewa," Yellowstone, 286 N.L.R.B. at 993, has no applicability to this case since in Yellowstone once the pre-hire agreement expired, there was nothing illegal about the employer's objective in repudiating the agreement. However, in the present case, the record makes it clear that the unions' actions had the illegal objective of coercing Harper into bargaining with an uncertified union or forcing Limbach to disassociate itself from Harper. Indeed, there is not a scintilla of evidence to support a conclusion that the unions would have disclaimed if Harper had become a union shop upon Carlough's demand.
 
 
 82
 In reaching our result we do not write on a blank slate for Gottfried v. Sheet Metal Workers' Local No. 80, 876 F.2d 1245, 1250 (6th Cir.1989), supports Limbach's argument that the unions could not freely repudiate the section 8(f) agreements upon their expiration since the objective of the repudiation was illegal under the NLRA. Gottfried involved the same disclaimer scheme at issue in this case but was concerned with Local 80 in Detroit, against which Limbach had filed unfair practice charges. The allegations were virtually identical to those made here, that is, that the unions refused to bargain with Limbach over the renewal of pre-hire agreements and threatened Limbach employees with sanctions for continuing to work for Limbach after the expiration of the pre-hire agreement, the objective being to pressure Harper into signing a labor agreement with an uncertified union. Id. at 1246.
 
 
 83
 After Limbach filed its charges, the regional director of the National Labor Relations Board petitioned for injunctive relief against the union pending the final adjudication of the charges, arguing that the repudiation was an unfair labor practice because it was prompted by an illegal motive. Id.
 
 
 84
 The district court, relying on Deklewa and Yellowstone for the proposition that the unions had an absolute right to repudiate their collective bargaining relationship with Limbach upon the expiration of the section 8(f) contract regardless of the objective of the repudiation, denied the petition for injunctive relief. The district court found that the contrary theory, posited by the regional director, was so lacking in merit that the regional director could not properly have found reasonable cause to believe that the unions had committed an unfair labor practice. The district court concluded, therefore, that injunctive relief would be inappropriate and that it did not have the power to grant such relief. Id. at 1248.
 
 
 85
 The court of appeals reversed, remanding the case to the district court to consider the merits of the regional director's claim for injunctive relief. The court of appeals found that the regional director's theory was not frivolous and that the Board "could well conclude, ... that an action normally lawful may be unlawful if undertaken to accomplish a forbidden objective." Id. at 1247. The court of appeals recognized the general principle that "[i]n the absence of any such improper objective, it is clear that the unions would have been free to terminate their bargaining relationship with Limbach upon the expiration of the prehire agreement." Id. at 1246. This was the holding in Deklewa. Id. at 1249.
 
 
 86
 However, the court found that the decisions in Deklewa and Yellowstone did not answer the questions posed by the regional director's claims in his petition for injunctive relief, in which the variable of improper motive was added to the Deklewa scenario. Id. Specifically, the court distinguished Yellowstone for the reasons discussed above. As the court read Yellowstone, "there was nothing illegal about the employer's objective in repudiating the bargaining relationship once the prehire agreement had expired. Under the regional director's theory in the case at bar, by contrast, the object of the repudiation was illegal, and the repudiation itself was an unfair labor practice." Id. at 1250.
 
 
 87
 Since the issue before the Gottfried court was the propriety of the denial of a preliminary injunction, the court of appeals did not definitely pass on the merits of the regional director's theory, as it had only to determine whether the district court was correct in finding the theory totally without merit. It found the theory not to be so lacking and, in reversing the district court's denial of the preliminary injunction, it commented, "[i]f that [coercing Harper into bargaining] was in fact the object of the economic pressure the unions were putting on Limbach by refusing to deal with it, we find it hard to see why the regional director is not correct in suggesting that the unions were violating the secondary boycott provisions of the [NLRA]." Id. In finding that the regional director's theory was not frivolous, the court noted that "[t]he secondary boycott provisions of the [NLRA] 'clearly reflect a Congressional attitude that unions should have no power over neutral employers to compel secondary action.' " Id. at 1250-51 (quoting NLRB v. International Bhd. of Elec. Workers,, 405 F.2d 159, 163 (9th Cir.1968), cert. denied, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969)). Therefore, the right of a union unilaterally to terminate a contractual relationship for legitimate reasons does not extend to terminating for the purpose of applying economic coercion to achieve a prohibited secondary objective. Id. at 1251.[10]
 
 
 88
 While we find Gottfried instructive, we do not stop our analysis of the disclaimer scheme with it as we consider it appropriate to review the history of section 8(f) to determine if it has bearing on the issue of whether a disclaimer for an improper purpose may be an unfair labor practice. Section 8(f) of the NLRA, added in 1959, resulted from the recognition that the nature of the construction industry did not lend itself to successful operation under the provisions of the NLRA as it then existed. Under these provisions, the majority status of a union as the exclusive representative of the employees, once established, was presumed for a reasonable period of time. Upon expiration of the collective bargaining agreement, the employer was not free to withdraw recognition from the union unilaterally unless it had reasonable, good faith grounds for believing that the union had lost its majority status. Iron Workers, 843 F.2d at 772.
 
 
 89
 This presumption, which assumes a stable group of employees, did not function well in the construction field, in which the work force generally does not remain at a single job site long enough to designate a union and, as a result, both the employers and employees encountered problems. Id. at 772-73. The employers, who sought to make accurate estimates of their labor costs for project bids, had problems doing so without having union contracts. Similarly, employees lacked benefits of union representation available to other workers. As a result, the "pre-hire agreement" developed in the industry. Id. at 773.
 
 
 90
 However, the Board had determined that pre-hire agreements were illegal and unenforceable because they designated an exclusive union representative without establishment of majority status. The Board suggested that the industry seek an exception from Congress and section 8(f) is this exception. Id.
 
 
 91
 The general objectives of the 1959 amendments to the Act, including section 8(f), have been identified as the promotion and protection of employee free choice and labor relations stability. See Deklewa, 282 N.L.R.B. at 1382. Therefore, it seems appropriate to measure the positions taken by the unions and Limbach in terms of the extent to which each position achieves the appropriate balance between these dual congressional objectives.
 
 
 92
 The protection of employee free choice is the focus of attention in the argument made by the unions. They argue that upon their expiration they were absolutely free to disclaim their section 8(f) agreements with Limbach, and that to hold otherwise would "wreak havoc on the Congressional scheme governing construction industry labor relations." According to the unions, under Limbach's theory, a union, which is clearly not obligated to enter into a section 8(f) agreement with an employer, could be required by the employer to maintain a section 8(f) agreement, a rule directly contrary to the holding in Deklewa which cannot be squared with the voluntary nature of section 8(f) agreements.
 
 
 93
 We agree that section 8(f) agreements are voluntary and that neither the union nor the employer is obligated to enter one in the first instance. Further, under Deklewa, upon the expiration of the agreement, the union does not enjoy the presumption of majority status available to other unions under the Act. Therefore, both the union and the employer are free to repudiate the agreement and the employer is to be free from coercion intended to convince it to reach a successor section 8(f) agreement.
 
 
 94
 However, the unions' argument, focusing as it does only on the voluntary nature of section 8(f) agreements, glosses over the variable in this case which did not affect the decision in Deklewa. The unions focus on section 8(f), without addressing other sections of the NLRA. The unions' argument diverts attention from the actual issue, which is whether a union can disclaim a section 8(f) agreement in an attempt to achieve illegal secondary objectives prohibited by the NLRA and thus ignores the prohibition of secondary boycotts in section 8(b)(4). Accordingly, while Deklewa focused on the voluntary character of a section 8(f) agreement, it does not stand for the proposition that once in a section 8(f) agreement, the parties are free to do whatever they wish. In fact, the holding of Deklewa prohibiting the unilateral repudiation of the agreement clearly refutes such a stance. See also Deklewa, 282 N.L.R.B. at 1396, n. 13 ("[r]eferences in the legislative history to the 'voluntary' character of prehire agreements focus[ ] on the making or signing of such agreements, not the act of living up to one's contractual promises.") (concurring opinion).
 
 
 95
 Furthermore, we find that employee free choice is not protected by the unions' stance. Specifically, if the unions' reason for the disclaimers was to further an illegal secondary purpose and, if, as Limbach alleged and is clearly the fact, the unions put pressure on and threatened unionized Limbach employees to induce them to quit working for Limbach, it is hard to see how such actions foster employee free choice.[11] What is furthered is the continued life and power of the union.[12]
 
 
 96
 We also find that the second objective of the NLRA, stability in the construction industry, would not be promoted by the adoption of the unions' position on the disclaimer issue. Just as the decision in Deklewa promoted stability in the industry by precluding parties from unilaterally repudiating their voluntary agreements, precluding a union from disclaiming for an illegal secondary objective promotes stability. Both the employer and the union will better know their rights and obligations vis-a-vis a section 8(f) agreement. This helps remove doubt and avoid adversarial proceedings as a way to resolve disputes, and thus tends to effectuate the statutory policy of labor relations stability. Deklewa, 282 N.L.R.B. at 1383. See also Sheet Metal Workers Local Union No. 20 v. Baylor Heating and Air Cond., Inc., 877 F.2d 547, 554 (7th Cir.1989) (collective bargaining agreements promote stability).
 
 
 97
 Finally, precluding actions such as those taken by the unions here fulfills general statutory policies by integrating section 8(f) with other sections of the NLRA, namely section 8(b)(4). In Deklewa, the Board found that there was nothing in either the text or the legislative history of section 8(f) to suggest that it was intended to leave construction industry employers free to repudiate contracts at will. 282 N.L.R.B. at 1388. As a result, it found the employer's unilateral repudiation violated section 8(a) and was an unfair labor practice. Deklewa reflects the notion that Congress did not mean section 8(f) and section 8(f) agreements to operate in a vacuum, unaffected by the rest of the NLRA. See also NLRB v. Irvin, 475 F.2d 1265, 1271 (3d Cir.1973).
 
 
 98
 Section 8(b)(4) shields unoffending employers from pressures in disputes not their own while preserving the rights of unions to bring pressure on offending employers in primary labor disputes. Anderson, 422 F.Supp. at 1384. We find that there is nothing in the text or history of section 8(f) to suggest that the actions of a union with regard to a section 8(f) agreement are free from the section 8(b)(4) prohibitions against secondary boycotts. See also Deklewa, 282 N.L.R.B. at 1387 (Congress intended, and the structure of section 8(f) contemplates, limited linkage between section 8(a)(5) and section 8(e)). In Deklewa, the Board noted that simply because section 8(f) agreements are easier to obtain does not mean that Congress intended them to be voidable at will. 282 N.L.R.B. at 1383, n. 31. Similarly, we find that simply because section 8(f) provides a special method for union recognition for the construction industry, there is no reason to believe that Congress intended a union to be free to coerce a neutral employer into forcing a sister company to enter a section 8(f) agreement through disclaiming agreements with the neutral company, thereby thwarting the section 8(b)(4) prohibitions against secondary boycotts. The purposes of section 8(f) should not be achieved at the expense of the purposes of section 8(b)(4).
 
 
 99
 In fact, in further protection of employee free choice, the 1959 amendments to the Act provided that the limitations on coercive recognitional picketing contained in section 8(b)(7) apply to a union seeking to obtain a section 8(f) agreement. Deklewa, 282 N.L.R.B. at 1381; Iron Workers, 843 F.2d at 773. See also Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 632, 95 S.Ct. 1830, 1840, 44 L.Ed.2d 418 (1975) ("[o]ne of the major aims of the 1959 Act was to limit 'top-down' organizing campaigns, in which unions used economic weapons to force recognition from an employer regardless of the wishes of his employees.") The Board in Deklewa noted that there was no legitimate basis for not applying this rule to "successor 8(f) agreements." 282 N.L.R.B. at 1385.
 
 
 100
 We recognize that the unions see double-breasting as a serious threat to their survival in the construction industry and that the Integrity Clause/disclaimer scheme here was a direct result of such concern. However, the law does not prohibit the actions taken by the parent of Limbach and, as long as the separate employer status is maintained, Limbach is a neutral employer protected by the secondary boycott provisions. See C.E.K. Indus. Mech. Contractors, Inc. v. NLRB, 921 F.2d 350, 352, n. 3 (1st Cir.1990) (citations omitted). The union can still direct its activities toward a primary employer and is not precluded from seeking to unionize Harper in a legitimate way. However, as long as Limbach is a separate employer, it is protected from coercion. The unions in this case seek our approval to do what Congress has not seen fit to authorize, that is they ask us to permit them to be able to force a corporate parent to direct its separate subsidiaries to be either all union or all nonunion. This we will not do.
 
 
 101
 As a tangential issue on the section 8(b)(4)(ii) claim, the unions argue that the prohibition in section 8(b)(4)(ii) against coercion should not be read to include the unions' disclaimer of their section 8(f) agreements. The unions cite the Supreme Court as stating that the words, "threats, coercion, or restraints," as used in the statute are "nonspecific, indeed vague," and should be interpreted cautiously without a "broad sweep...." DeBartolo Corp. v. Florida Gulf Coast Trades Council, 485 U.S. 568, 578, 108 S.Ct. 1392, 1399, 99 L.Ed.2d 645 (1988). The unions assert that the Supreme Court has declined repeatedly to allow the concept of coercion to swallow up a range of activity left unregulated.
 
 
 102
 We reject this argument as applied to the circumstances here. We hold that a union's walking away from a bargaining relationship can constitute coercion within the meaning of section 8(b)(4)(ii) of the NLRA.[13]
 
 
 103
 Coercion has been defined as "non-judicial acts of a compelling or restraining nature, applied by way of concerted self help consisting of a strike, picketing or other economic retaliation or pressure in a background of a labor dispute." Local Union No. 48, Sheet Metal Workers International Ass'n v. Hardy Corp., 332 F.2d 682, 686 (5th Cir.1964) [emphasis added]. We hold that the threat of canceling their bargaining agreement could be a powerful economic weapon in the hands of the unions which, if used for prohibited reasons, constitutes coercion within the meaning of the NLRA. See Sheet Metal Workers Local 91 v. NLRB, 905 F.2d 417, 424 (D.C.Cir.1990) ("[i]t is well established that the otherwise lawful exercise of rights afforded by a collective bargaining agreement can become unlawful when aimed at securing an objective proscribed by section 8(b)(4)").
 
 VI.
 SEPARATE EMPLOYER ISSUE
 
 104
 The unions claim that Limbach and Harper are not separate employers within section 8(b)(4) and therefore the unions did not have a secondary motive under this section. In order for there to be a secondary motive to the unions' disclaimers, there must be a neutral employer that is the object of their "coercive actions." In this case, Limbach's theory is that it had no labor dispute with the unions, and therefore was a neutral employer, and that the unions' dispute was with Harper, which for 30 years had been a nonunion shop. The unions' position is that Limbach and Harper are not separate employers, and therefore they could not have a secondary motive in disclaiming the section 8(f) agreements and, as a matter of law, they could not be liable for a section 8(b)(4) violation.
 
 
 105
 The jury determined that Limbach and Harper are separate employers and the court denied the unions' motions for a directed verdict and a judgment notwithstanding the verdict on this issue. On appeal, the unions advance three reasons why the denial of these motions was error and why the jury determination cannot stand. First, the unions claim that the instructions given to the jury were fatally erroneous. Second, the unions argue that it was reversible error for the district court to exclude from evidence the decision of an administrative law judge recommending dismissal of a complaint against the International Union and Local 80 on the ground that Limbach was not a neutral employer. Third, the unions assert that, "on the facts adduced at trial, and applying a proper legal standard, the trial court should have granted the directed verdict requested by the defendants on this issue ..." We have considered each alleged error and reject each in turn.
 
 
 106
 a. Jury Instructions
 
 
 107
 The unions requested the following instruction be given on the "separate employer" status of Limbach, Limbach Constructors and Harper:
 
 
 108
 Separate corporate subsidiaries are separate employers if neither the subsidiaries nor the parent exercises control over the operations or labor relations of the other. However, if you find that Limbach Company exerts control over the operations and labor relations of Harper, or if you find that Limbach Constructors, Inc. exerts control over the operations and labor relations of Limbach Company and Harper, then you should find that Limbach Company and Harper are not separate employers. If you find that Limbach Company did not exercise control over the operations or labor relations of Harper, and if you find that Limbach Constructors, Inc. did not exercise control over the operations or labor relations of Limbach Company and Harper, then you should find that Limbach Company and Harper are separate employers. I instruct you that the imposition of a non-union framework upon a corporate subsidiary indicates a substantial degree of central control over labor relations. In this case, the test of separate employer status is whether, taken as a whole, the management, ownership, financial control, inter-relation of operations and control of operations among Limbach Constructors, Inc., Limbach Company and Harper is characteristic of the arm's length relationship found among unintegrated companies. As I have already instructed you, plaintiff has the burden of proving that Limbach Company and Harper are separate employers.
 
 
 109
 App. at 3412. [Emphasis added].
 
 
 110
 The unions' requested instruction was denied and over the unions' objection the following instruction was given by the district court:
 
 
 111
 The following are general principles of law regarding separate employers: whether Limbach Company and Harper are separate employers for purposes of the National Labor Relations Act depends upon an analysis of the following factors: one, the interrelationship of the operations; second, common management; third, centralized control over labor relations; and, fourth, common ownership.
 
 
 112
 While none of the factors, separately viewed, is controlling, you should particularly consider the first three factors to determine whether there was a functional integration of these companies and, especially, whether there was centralized control of labor relations.
 
 
 113
 Separate employer status depends upon all of the circumstances of the case, and not all of the controlling factors need to be present.
 
 
 114
 Separate corporate subsidiaries are separate employers if neither the subsidiaries nor the parent exercises actual control over labor relations or the overall operations of the other.
 
 
 115
 Common ownership and potential control alone will not establish that otherwise separate employers are a single employer. Rather, there must be actual or active control over the labor relations or the overall operations.
 
 
 116
 If you find that Limbach Constructors, Inc. exerted actual control over the labor relations or the overall operations of Limbach Company and Harper, then you should find that Limbach Company and Harper are not separate employers.
 
 
 117
 However, if you find that Limbach Constructors, Inc. did not exercise actual control over the labor relations or the overall operations of Limbach Company and Harper, then you should find that Limbach Company and Harper are separate employers.
 
 
 118
 App. at 3472-74. [Emphasis added].
 
 
 119
 We find no shortcomings in the district court's jury instructions and no error in the court's refusal to give the requested instructions. Even the unions acknowledge that the district court's instructions correctly identified the four criteria used to determine the separate employer issue and advised the jury that centralized control over labor relations is the most important factor.[14] The jury charge adequately instructed the jury that the issue before it was whether Limbach and Harper, two formally separate entities, were actually part of a single integrated enterprise so that for purposes of the Act there was in fact only a single employer. See NLRB v. Browning-Ferris Industries of Pennsylvania, Inc., 691 F.2d 1117, 1122 (3d Cir.1982) ("[t]he question in the 'single employer' situation, then, is whether the two nominally independent enterprises, in reality, constitute only one integrated enterprise." [Emphasis in original].
 
 
 120
 Viewed in light of the evidence, the instructions given did fairly and adequately submit the issue of separateness of employers to the jury and would not have mislead the jury. In fact, we note that the district court took added care to avoid instructions which might have confused the jury. The charge adequately apprised the jury that it should consider the four criteria to determine whether Limbach and Harper were separate employers and informed the jury that the control over labor relations was to be the focus of its consideration, as the unions requested in their request to charge.
 
 
 121
 b. Exclusion from Evidence of an Administrative Law Judge's Decision that Limbach and Harper are not Separate Employers Under the Act
 
 
 122
 As we previously pointed out in our discussion of Gottfried v. Sheet Metal Workers' Local No. 80, 876 F.2d at 1245, as a result of the same disclaimer scheme involved in this case, Limbach filed an unfair labor practice charge with the Board. A complaint was issued alleging that Local 80's disclaimer was an unfair labor practice, an evidentiary hearing was held, and a decision on the complaint was reached on June 5, 1989, by an administrative law judge recommending dismissal of the complaint against the International Union and Local 80 on the ground that Limbach was not a neutral or secondary employer. Local Union 80, Sheet Metal Workers, AFL-CIO and Sheet Metal Workers International Association and Limbach Company, Case No. 7-CC1423, slip op. (June 5, 1989).[15] An appeal of this decision is pending before the Board. The unions sought to introduce this decision into evidence but the district court excluded the decision.[16] The unions claim that this exclusion was erroneous and requires reversal.
 
 
 123
 We reject this argument. Even if we agreed that the decision of the administrative law judge may have had probative value as to the issue of the separate employer status of Limbach and Harper, we would find no abuse of discretion by the district court in excluding it from evidence. Hill v. Equitable Trust Co., 851 F.2d 691, 699 (3d Cir.1988), cert. denied, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989).
 
 
 124
 The decision could not have preclusive effect since it is not a final agency decision. See Stein Seal Co. v. NLRB, 605 F.2d 703, 706 (3d Cir.1979). See also Altemose Constr. Co. v. Building and Constr. Trades Counsel of Philadelphia, 751 F.2d 653, 661-62 (3d Cir.1985), cert. denied, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986) (no preclusive effect against an individual plaintiff since that party has no control over the factual or legal issues tried before the Board in which case the General Counsel controlled the litigation). Moreover, findings in a jury verdict and a decision of an administrative law judge are not destroyed simply because they are contrary. United Brick & Clay Workers v. Deena Artware, 198 F.2d 637, 642-43 (6th Cir.), cert. denied, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694 (1952).
 
 
 125
 Resolution of whether Limbach and Harper are separate employers under the NLRA depended on findings made by the jury. The court adequately instructed the jury on the criteria to use to decide the issue and even if the findings of the administrative law judge could have been admitted, the district court did not abuse its discretion in excluding them. In fact, we believe that if the jury knew of the findings it might have been discouraged from doing its job as factfinder on the separate employer issue.[17]
 
 
 126
 c. Denial of Motions for a Directed Verdict and Judgment Notwithstanding the Verdict
 
 
 127
 On July 10, 1990, the unions unsuccessfully moved for a directed verdict on the basis, inter alia, that Limbach, Limbach Constructors, Inc. and Harper are a single employer within the meaning of the Act and that no reasonable jury could conclude otherwise. The unions made the same arguments in a motion for judgment notwithstanding the verdict, and in a renewed motion for judgment notwithstanding the verdict, both of which were denied.
 
 
 128
 On appeal, the unions assert that it was error for the court to deny their motions, asserting that the evidence before the jury left no question that Limbach and Harper are not separate employers within the meaning of the NLRA. We, however, find that, based on the evidence presented to the jury, the district court did not err in denying the motions.
 
 
 129
 Corporate subsidiaries are normally treated as separate persons under the NLRA. United Telegraph Workers v. NLRB, 571 F.2d 665, 667 (D.C.Cir.), cert. denied, 439 U.S. 827, 99 S.Ct. 101, 58 L.Ed.2d 121 (1978). Accordingly, separate employer status is usually a question of fact to be resolved by the jury. Sheet Metal Workers Int'l Ass'n, Local Union No. 223, AFL-CIO v. Atlas Sheet Metal Company of Jacksonville, 384 F.2d 101, 107 (5th Cir.1967). However, corporate subsidiaries may lose their status as separate persons when they are operated as a single business enterprise, a determination based on four factors: common ownership; interrelation of operations; common management; and centralized control of labor relations, the factors which the district court described to the jury in its charge. Radio & Television Broadcast Technicians Local 1264 v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965); Eichleay Corporation v. International Ass'n of Bridge, Structural and Ornamental Iron Workers, 944 F.2d 1047, 1062 (3d Cir.1991). Therefore, we review the evidence presented to the jury in light of these four factors to determine if the unions were entitled to a directed verdict or a judgment notwithstanding the verdict on this issue.
 
 
 130
 Walter Limbach was the prime source of evidence on this point. He testified that Limbach was reorganized for the purpose of expanding operations into new growth areas via open shops, i.e., nonunion operations, and that Jovis was specifically formed to acquire nonunion operations. Walter Limbach acknowledged his understanding that in order to succeed in keeping these new acquisitions "open", Limbach and the new acquisition, (ultimately Harper), would have to be considered separate employers. Therefore, he sought legal advice on how to ensure that Limbach and Harper would be considered separate employers.
 
 
 131
 In our analysis on this point we first acknowledge that both Limbach and Harper were owned by the same parent, Limbach Constructors, Inc., so that the common ownership criterion is satisfied. However, since common ownership is always present in a sister-corporation situation, it alone does not establish single employer status. United Telegraph Workers, 571 F.2d at 667. Since potential control would always rest with the parent in such a situation, what is required is actual control. See, e.g., American Federation of Television & Radio Artists v. NLRB, 462 F.2d 887, 892 (D.C.Cir.1972).
 
 
 132
 As to interrelation of operations, Walter Limbach testified that Limbach and Harper maintain separate offices and separate bank accounts, and do not work or compete with each other on any projects. There are no intercompany loans or cross-guarantees on performance bonds and there is no shifting back of employees from one company to another, though several Limbach executives resigned to work for Harper after it was acquired by Jovis.
 
 
 133
 On centralization of management, Walter Limbach testified that after the restructuring, central management and certain staff functions, including executive management, business staff, personnel staff, legal staff, marketing, estimating and administrative services were centralized in Limbach Constructors, Inc. Each subsidiary pays Limbach Constructors for these services. Each company has its own president. According to Walter Limbach's testimony, these presidents ran Limbach and Harper independently. However, although both Limbach and Jovis had a separate board of directors, these boards were non-operational, except to fulfill legal requirements, and the president of both companies reported directly to Walter Limbach.
 
 
 134
 On the critical issue of centralized control over labor relations, Walter Limbach stated that each chief officer is responsible for the labor relations of his company. He testified that whereas the centralization of management functions discussed above was intended to benefit all of the subsidiaries, labor relations were intentionally kept decentralized.
 
 
 135
 Walter Limbach testified that each subsidiary handled its own labor relations. In particular, he testified that he was not in charge of any labor decisions of Harper, and could not force Harper into signing a collective bargaining agreement with the union because he was without authority to do so. Indeed, he was not an officer of Harper. According to Walter Limbach's testimony, George Harper, or his replacement, was the decision maker as to whether Harper would operate union or nonunion.
 
 
 136
 We note, however, that when Carlough first approached Walter Limbach about the Harper operation, Walter Limbach did not totally disavow himself from the situation. In fact, he met alone first with Carlough's assistant Cassidy and later with Carlough himself to discuss the matter, although on both occasions he stated that he had no authority to bind Harper to a collective bargaining agreement. Walter Limbach testified that he met with Cassidy and Carlough at the request of Limbach's president, because the union representatives approached him. However, he maintained that he made no proposals on behalf of Harper at these meetings. He further testified that he never advised Harper's management on the issue.
 
 
 137
 Subsequent to the unions' disclaiming the section 8(f) agreements, Walter Limbach presided over strategy meetings held to determine how to respond to the locals' disclaimers. He sent memos to Limbach's president and to branch managers containing advice on handling post-disclaimer labor and business problems. However, Stephen Wurzel, president of Limbach, and Paul Stock, Los Angeles branch manager, testified that they did not always accept the advice in the memos.
 
 
 138
 Viewing the evidence in the light most favorable to Limbach, we cannot say that there was no question of material fact for the jury and that any verdict other than the one sought by the unions would be erroneous under the governing law. Macleary v. Hines, 817 F.2d 1081, 1083 (3d Cir.1987). Thus, the district court's denial of the directed verdict motion will be affirmed.
 
 
 139
 Although some of Walter Limbach's testimony disclosed a fair amount of control over the operations of the whole organization and a certain amount of centralized management, he also testified that it was always intended that each subsidiary direct its own labor relations and that they did so. Thus, he testified in fact that labor relations decisions were made by individual subsidiaries. Therefore, in light of the factors to be used to determine separate employer status, there was an issue of fact for the jury.
 
 
 140
 Similarly, we find that the record is not so critically deficient of a minimum quantum of evidence from which a jury might reasonably have reached its conclusion so as to require us to reverse the district court's denial of the motion for judgment notwithstanding the verdict. Kinnel v. Mid-Atlantic Mausoleums, Inc., 850 F.2d 958, 961 (3d Cir.1988). Although there is evidence to support the unions' claim that Limbach and Harper are not separate employers, as discussed above, there was also evidence from which a jury could determine otherwise. It cannot be said that the record reflects so little evidence of separateness that the jury's verdict should have been overturned.[18]
 
 
 141
 We also reject the unions' suggestion that the separate status of Limbach and Harper should be viewed with extra scrutiny in view of Walter Limbach's acknowledgement that a purpose of the reorganization and formation of Jovis was so the organization could acquire nonunion shops. The four factors discussed above are those to be considered in determining the separate status issue and employer motive is not one of those factors. Indeed, it would be remarkable to hold that the very fact that an organization is attempting to order its affairs so as to satisfy legal standards gives reason in itself to question whether it has succeeded. If anything, quite the opposite might be thought to be true.
 
 VII.
 APPEAL OF LIMBACH COMPANY
 
 142
 Limbach alleges three errors by the district court. First, it asserts that the court erroneously denied its motion for judgment on liability notwithstanding the verdict in favor of Locals 12, 17 and 98 on the secondary boycott claims. Second, Limbach contends that the district court erred in excluding evidence of damages in Pittsburgh, Boston and Columbus during the damages phase of the trial. Third, Limbach claims that the district court erred in granting the unions' directed verdict motion on its antitrust claims. We consider each alleged error in turn and reject them.
 
 
 143
 a. Judgment Notwithstanding the Verdict for Locals 12, 17 and 98
 
 
 144
 In response to Special Verdict No. 2 the jury found that the International Union and each of its affiliated local unions had committed unfair labor practices within the meaning of section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4). However, the jury found, in response to Special Verdict No. 3, that the conduct of only the International and Local 108 was a substantial factor in bringing about harm to Limbach's business or property. The jury found that the conduct of Locals 12, 17 and 98 was not a substantial factor in causing harm to Limbach, and consequently the court entered judgment in their favor and against Limbach on the secondary boycott claims. On August 3, 1990, the court denied Limbach's motion for judgment notwithstanding the verdict.
 
 
 145
 On appeal, Limbach claims that the denial of its motion for judgment notwithstanding the verdict was error. It argues that the jury found that Locals 12, 17 and 98 committed unfair labor practices by their disclaimers and thus the liability aspect of its secondary boycott claim against these locals was clear. It also urges that it presented evidence of damages it sustained in the Pittsburgh, Columbus and Boston metropolitan areas, which satisfied the other aspect of its claim, that it had sustained some injury to its business as a result of the unlawful secondary activity.
 
 
 146
 We conclude, however, that the jury determination that Limbach suffered no damages in Pittsburgh, Boston or Columbus is supportable on the record and thus the district court properly entered judgment against Limbach and in favor of Locals 12, 17 and 98 on the secondary boycott claims. We acknowledge that Limbach presented evidence that the unions' conduct, specifically that of Locals 12 and 98, caused it to sustain out-of-pocket expenses of $5,341.91 in Pittsburgh and $17,305.07 in Columbus for additional payroll taxes due to the cost of hiring replacements. Limbach also presented evidence that the conduct of Local 17 caused it damages in the Boston area, in particular that it is subject to potential pension withdrawal liability in excess of $2,400,000 as a direct result of Local 17's disclaimer.[19] This potential liability exists under ERISA when an employer ceases to have an obligation to contribute under a multi-employer pension plan. 29 U.S.C. §§ 1381 and 1383.
 
 
 147
 But the unions presented expert testimony that Limbach suffered no damages in Pittsburgh, Boston and Columbus as a result of the disclaimers. Their expert, Mark Smith, testified that Limbach was a significant mechanical contractor in the market before and after the disclaimers. He testified that it was possible that Limbach's profitability might even have increased because of the disclaimers, as a result of the lower cost of nonunion labor. He also challenged the testimony of Limbach's expert that Limbach lost sales due to the disclaimers. Furthermore, the potential pension withdrawal liability was unassessed against Limbach at the time of the trial and, indeed, apparently still is, and as it is speculative, the jury had the right to reject it. See, generally, Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971).
 
 
 148
 Accordingly, viewing the evidence in the light most favorable to the prevailing locals, the district court's denial of the motion for judgment notwithstanding the verdict was not erroneous. An element of a secondary boycott claim is damages. Here, the jury determined that Limbach suffered no overall damages in Boston, Columbus and Pittsburgh, a determination finding support in the record.
 
 
 149
 Because we determine that the jury's finding that Limbach suffered no damages in these areas is sustainable on the record, we further reject Limbach's claim that the district court erred in allowing Limbach to present evidence of damages only as to its Los Angeles operations. The district court properly excluded evidence on damages in Pittsburgh, Boston and Columbus because of the jury's response to Special Verdict No. 3. That is, the jury found that Limbach suffered no harm in those areas, and thus when the trial resumed it would have been inappropriate to receive further evidence on the point.
 
 
 150
 Because we do not disturb the finding that Limbach was not damaged in the Pittsburgh, Boston and Columbus areas, the areas involving Locals 12, 17 and 98, there is no reason for Locals 12, 17 and 98 to be included on the remand required on the secondary boycott aspect of this case. The issue of harm is separate and distinct from that of whether the unions' actions violated the Act and no injustice will ensue from excluding Locals 12, 17 and 98 from the retrial. Childers, 842 F.2d at 699.
 
 
 151
 b. Limbach's Antitrust Claims
 
 
 152
 Limbach asserted a claim pursuant to the Clayton Act, 15 U.S.C. § 15,[20] that the four locals and the International entered into an unlawful conspiracy with the Executive Committee of SMACNA, the multi-employer bargaining association of which Limbach was a member. According to Limbach, SMACNA agreed to permit the Integrity Clause to be a permissive subject of bargaining and in exchange the unions agreed to take actions necessary to interrupt the labor supply to union contractors who were affiliated by common ownership with nonunion contractors, thereby reducing or eliminating nonunion competition to SMACNA. Limbach contended that the International Union implemented this unlawful agreement by fostering the disclaimers by the locals.
 
 
 153
 The district court granted the motion for a directed verdict motion on the antitrust claims as it found that there was not enough evidence of a conspiracy between SMACNA and the locals or International or of a causal relationship between any conspiracy and the disclaimers to submit the antitrust claims to the jury. The court also held that any conspiracy that did exist was not actionable because of the statutory or non-statutory exemptions to liability under the antitrust laws for labor organizations. Limbach claims that the district court erroneously granted the motion for a directed verdict, asserting that it presented enough evidence to create a jury issue in the case.
 
 
 154
 The district court properly directed the verdict on Limbach's antitrust claims.[21] We find that the evidence relied on by the unions fails to raise a reasonable inference of a conspiracy. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-88, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).
 
 
 155
 The evidence relied on by Limbach in support of its antitrust conspiracy claim is basically two-fold. First, Limbach cites to the meeting which took place between SMACNA and Edward Carlough, representing the International, on April 15, 1985, in Washington, D.C., and the subsequent memo from Russell Smith, Director of Labor Relations for SMACNA, to Edward Carlough in which he wrote that the "following items were discussed and agreed upon at the [April 15, 1985] meeting."
 
 
 156
 In further support of the claim that an agreement was reached at this meeting, Limbach claims that the union had two opportunities unilaterally to implement the anti-double-breasting policy before the April 15 meeting, in February 1985, prior to the scheduled expiration of the collective bargaining agreement between Limbach and Local 80 in Detroit, and in February 1985, upon the NJAB decision nullifying the contract between Limbach and Local 17. Yet the International took no action until three days after the April 15 meeting when it made its first attempt to disclaim.
 
 
 157
 We agree with the district court that this evidence is not sufficient to permit a reasonable inference of a conspiracy between SMACNA and the International. The only testimony before the court regarding this meeting was from Edward Carlough and James Roth, a contractor who was a member of the SMACNA Executive Committee. Both testified that the meeting was purely an informational meeting regarding the Integrity Clause and Carlough testified specifically that there was no agreement reached at or as a result of the meeting. Further, Carlough testified that provisions of labor agreements used by the Union are always drafted unilaterally. As to the April 16 memo from Russell Smith, Carlough testified that the use of "agreed" in that memo merely reflected an understanding of what Carlough told SMACNA at the meeting. No witness testified that any agreement was reached at that meeting.
 
 
 158
 Furthermore, there was evidence contradicting the notion that SMACNA made any agreement with the International to the effect that they would endorse the Integrity Clause. SMACNA never took a position on the Integrity Clause or on double-breasting. In addition, memos from SMACNA indicated that it had serious doubts about the legality of the Integrity Clause and whether it should be the subject of bargaining. On April 17, 1985, two days after the meeting at which the alleged conspiracy was entered, the SMACNA Executive Committee sent to every chapter a cautionary memorandum on the Integrity Clause to the effect that it might result in secondary boycott and antitrust claims being brought against the unions.
 
 
 159
 Finally, we are in accord with the district court's finding that there was no evidence from which a jury could conclude that there was any causal relationship between the disclaimers, which formed the basis of the alleged illegal antitrust activity by the unions, and the alleged agreement between SMACNA and the unions. As the court observed, at the April 15 meeting, the disclaimers were never discussed. However, they were previously discussed by Carlough at his first meeting with Walter Limbach in 1983 when he told Limbach that the unions would file grievances, and if the grievances were not successful, the unions would disclaim. In fact, the SMACNA meeting involved the Integrity Clause, which in reality had no relevance to Limbach because it was already known that Limbach was a "double-breasting" employer. The import of the Integrity Clause was to allow a union to rescind an agreement with an employer upon finding out that the employer was double-breasting. No one testified of any discussion at the meeting concerning Limbach. This fact further undermines any connection between the meeting between SMACNA and Carlough and the disclaimers affecting Limbach.
 
 
 160
 Even taking Limbach's allegations regarding the conspiracy at their best, there is no evidence in the record to link any agreement regarding the Integrity Clause to the disclaimers against Limbach. The fact that the first disclaimer was made after this meeting proves nothing since the Integrity Clause was not applicable to Limbach. Furthermore, the disclaimers were not the first attempt to "get" Limbach, since the union had previously filed grievances against Limbach, prior to the meeting with SMACNA and prior to the development of the clause. Thus, even were there a conspiracy, it was not a substantial factor in the decision to disclaim, since that decision had been made as early as November of 1983, when Walter Limbach and Edward Carlough met and Carlough threatened the disclaimers. Thus, Limbach's argument that the timing of the disclaimers proves a conspiracy is fundamentally flawed.[22]
 
 VIII.
 CONCLUSION
 
 161
 The order of the district court entering judgment in favor of Limbach against the International Union and Local 108 will be reversed and remanded to the district court for further proceedings consistent with this opinion. The order entering judgment in favor of Locals 12, 17 and 98 will be affirmed. The orders denying Limbach's motions for a new trial and denying the motions of Limbach, the International Union and Local 108 for judgment notwithstanding the verdict will be affirmed. The order of the district court granting the directed verdict on the antitrust claims will be affirmed. The issue to be tried on remand is whether the actions of the International and Local 108 constitute a secondary boycott violation under section 8(b)(4)(ii) of the NLRA. At the retrial Limbach and Harper are to be considered separate employers within the meaning of the NLRA and if the International and the local are held liable, the quantum of damages shall be determined at the trial or shall be those already awarded.[23] Locals 12, 17 and 98 will be allowed costs against Limbach but otherwise the parties will bear their own costs on this appeal.
 
 
 162
 SLOVITER, Chief Judge, concurring in part and dissenting in part.
 
 
 163
 My difference with the majority is narrow but is directed to a significant issue: whether the secondary boycott provisions of the National Labor Relations Act are applicable to a labor union seeking to protect its members from the effects of the double-breasted operations of the employer. I believe that the potential of a large damage verdict in this situation unevenly tilts the playing field designed by Congress. Thus, while I agree with the majority that there is insufficient evidence to support a jury verdict in favor of Limbach on its antitrust conspiracy claim, and I agree that the jury's verdict on Limbach's secondary boycott claim cannot stand because there is no basis to find the unions liable for inducement under section 8(b)(4)(i), I disagree with the majority's decision to remand for an additional determination of the unions' liability under section 8(b)(4)(ii). I would hold that as a matter of law Limbach is not a secondary employer for purposes of the secondary boycott provisions of section 8(b)(4).
 
 
 164
 For the purposes of the issue before us, I can accept arguendo the majority's premises that a union has the obligation to bargain after a section 8(f) agreement has expired and that a union's disclaimer of further agreements with the employer can, under certain circumstances, be treated as coercive. The analytic stumbling block for me lies in the majority's use of the single employer doctrine to conclude that a union that chooses not to deal with one side of a double-breasted employer is in violation of the secondary boycott provisions of the NLRA. As far as I know, no case has ever so held. The majority cites none, nor do the parties. Moreover, I believe that the majority reaches its conclusion through a misapplication of the single employer doctrine and an unwarranted extension of the secondary boycott provisions.
 
 
 165
 The single employer doctrine was originally adopted by the National Labor Relations Board as a basis for determining whether to aggregate the business volume of related concerns in order to meet the minimum dollar volume of business requirement imposed by the Board itself as a jurisdictional threshold. See 21 NLRB Ann.Rep. 14-15 (1956) (describing single employer doctrine Board would apply to determine whether two firms warrant treatment as single employer for jurisdictional purposes); see also Comment, Double-Breasted Operations In The Construction Industry: A Search For Concrete Guidelines, 6 U.Dayton L.Rev. 45, 48-49 & n. 22 (1981) (Dayton Comment). In Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam), the Court referred approvingly to the Board's use of four criteria (interrelationship of operations, common management, centralized control of labor relations and common ownership) as determinative of whether nominally separate business entities are an integrated enterprise and hence a single employer for the applicable jurisdictional standards.
 
 
 166
 Thereafter, the Board and the courts applied the same single employer criteria in several other contexts. For example, two wholly-owned subsidiaries may constitute a single employer, thus obligating one to follow a labor agreement entered into with the other. See South Prairie Constr. Co. v. Local 627, International Union of Operating Eng'rs, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (per curiam). The single employer doctrine also has been used to determine the bargaining obligations of different components of a corporate enterprise. See United Tel. Workers v. NLRB, 571 F.2d 665 (D.C.Cir.), cert. denied, 439 U.S. 827, 99 S.Ct. 101, 58 L.Ed.2d 121 (1978). This court has applied the traditional single employer test to determine whether a corporate enterprise committed an unfair labor practice by maintaining double-breasted operations and refusing to bargain with the representative of the unionized portion of the enterprise as the representative of the purportedly non-unionized portion of the enterprise as well. See NLRB v. Al Bryant, Inc., 711 F.2d 543, 550-52 (3d Cir.1983), cert. denied, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984).
 
 
 167
 The four-part formula used to determine the existence of a single employer reflects the underlying purpose of the single employer doctrine, which is to treat a functionally integrated company as one employer for labor relations purposes despite its separate corporate entities. The single employer doctrine addresses the concern that an employer may be attempting to avoid the responsibilities of a labor contract or a labor-management relationship through corporate structure. See, e.g., Penntech Papers, Inc. v. NLRB, 706 F.2d 18 (1st Cir.), cert. denied, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983); Local No. 627, International Union of Operating Eng'rs v. NLRB, 518 F.2d 1040 (D.C.Cir.1975), modified sub nom. South Prairie Constr. Co. v. Local No. 627, International Union of Operating Eng'rs, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); Gerace Constr., Inc., 193 N.L.R.B. 645 (1971).
 
 
 168
 The reflexive application of the single employer doctrine to concerted labor efforts to resist a corporate enterprise's double-breasted operations fails to adequately address the pertinent policy issues posed by double-breasting. Double-breasted operations began to pervade the construction industry in the late 1970's after they received the Board's imprimatur of approval. See Dayton Comment, 6 U.Dayton L.Rev. at 45-47, 50. As this court has previously recognized, "[a] contractor engaged in a double-breasted operation has the best of both worlds, since it can bid through its union company when jobs require union contractors but can underbid a unionized company through its second operation on jobs that do not require union contractors." NLRB v. Al Bryant, Inc., 711 F.2d at 552.
 
 
 169
 The potential destructiveness to the union of a double-breasted operation is self-evident. As one commentator has noted:
 
 
 170
 double-breasting poses a significant threat to the labor movement. From the union perspective, double-breasting improperly permits an employer to shed bargaining and contractual responsibilities while still retaining the financial benefits of ownership. Double-breasting not only diverts work to the nonunion sector, but it also puts considerable pressure on unions to grant wage and benefit concessions so that the shrinking number of union firms will remain competitive.
 
 
 171
 Befort, Labor Law and the Double-Breasted Employer: A Critique of the Single Employer and Alter Ego Doctrines and a Proposed Reformulation, 1987 Wis.L.Rev. 67, 69.
 
 
 172
 The general approach of Congress in the labor relations area has been to allow each party to use economic and bargaining strategies to exert pressure upon the other. See Senate Committee on Education & Labor, S.Rep. No. 573, 74th Cong., 1st Sess. 2 (1935) ("[d]isputes about wages, hours of work, and other working conditions should continue to be resolved by the play of competitive forces"). By applying the secondary boycott provision in what is essentially an economic struggle between an employer and its employees, the majority has deprived the unions of their traditional weapons and thereby shifted, perhaps irreparably, the balance between the parties in the construction industry.
 
 
 173
 The secondary boycott rules were not designed for the double-breasted employer situation. "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is the party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands." International Bhd. of Elec. Workers v. NLRB, 181 F.2d 34, 37 (2d Cir.1950), aff'd, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).
 
 
 174
 Congress has condemned secondary boycotts because it is believed that they "unfairly ... enmesh in a proliferating dispute a person who [is] in truth a 'neutral,' a 'stranger' to that dispute who was 'uninvolved' in the union's grievance against the primary employer." See R. Gorman, Labor Law 241 (1976); National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 627, 87 S.Ct. 1250, 1259, 18 L.Ed.2d 357 (1967) (broad policy objective of section 8(b)(4) is the protection of neutrals against secondary pressure); NLRB v. Local 810, Steel, Metals, Alloys & Hardware Fabricators, 460 F.2d 1, 5 (2d Cir.) (same), cert. denied, 409 U.S. 1041, 93 S.Ct. 527, 34 L.Ed.2d 491 (1972).
 
 
 175
 The plain fact is that irrespective of whether the two prongs of a double-breasted operation meet the technical four criteria test of a single employer, the non-unionized portion of a double-breasted operation is not a "neutral" bystander nor is it a "stranger" to the dispute. The raison d'etre of establishment of a double-breasted operation is the effort of the employer to be free from union constraints in a portion of its operation. Therefore, a union should be free to use traditional labor weapons, whether strike or disclaimer, in an effort to stem the tide of parallel non-union operations by companies with which it has labor agreements.
 
 
 176
 In contrast to the traditional secondary boycott where a union seeks to coerce a secondary employer merely because the secondary does business with an offending employer over which it has no control, see, e.g., NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); NLRB v. Milk Drivers & Dairy Employees Local Union No. 584, 341 F.2d 29 (2d Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 39, 15 L.Ed.2d 64 (1965); Chauffers, Teamsters & Helpers Local Union No. 175 v. NLRB, 294 F.2d 261 (D.C.Cir.1961), this is an intra-family affair. There is no dispute in this case that Walter Limbach reorganized the corporate enterprise in order to ensure that Harper would remain non-union. He allowed George Harper, a man who successfully defeated union efforts for thirty years, to remain as the president of Harper. Limbach sent its own management personnel to Harper to serve as the executive management of Harper. Furthermore, John Fern, one of Limbach's Vice Presidents, was sent to Jovis to serve as its President and was given official labor relations responsibilities for Jovis.
 
 
 177
 Notwithstanding the technical separation, there was extensive integration of Limbach Incorporated's operations. Limbach and Harper utilized the same accounting and payroll services, personnel services, legal assistance, market research, advertising and sales services, mechanical engineering services, estimating services, and administrative services including procurement and assignment of automobiles, janitorial records and maintenance of company records. Thus, while I do not suggest that there was any impropriety in Limbach's maintenance of separate unionized and nonunionized components, I believe that it is neither unexpected nor improper for the unions to react using the traditional labor weapon of disclaimer to such an overt effort by an employer to operate in two worlds.
 
 
 178
 It is therefore irrelevant that in this particular case the Harper operation in Florida may not have been directly competitive with the unionized plants of Limbach, Inc. The object of the unions' pressure was the Limbach organization, the primary employer. Just as it was important to Limbach to maintain the non-unionized component, so also was it a legitimate labor objective of the unions to have the entire operation unionized. The majority's result insulates the employer from collective activity designed to prevent erosion of gains secured for the benefit of the employees in the unionized portion of the entity.
 
 
 179
 As a matter of law, I would hold that the single employer doctrine is inapplicable to a double-breasted enterprise for purposes of application of the secondary boycott provisions. As long as the unions' actions do not contravene other provisions of the NLRA, I believe that Congress' design does not contemplate that they be subject to liability for secondary boycotts because they exert economic pressure on double-breasted employers.
 
 
 
 *
 For Opinion on Rehearing, see p. 1240
 
 
 *
 Honorable John Minor Wisdom, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 The Integrity Clause provided:
 Section One: A 'bad-faith employer' for purposes of this Agreement is an Employer that itself, or through a person or persons subject to an owner's control, has ownership interests (other than a noncontrolling interest in a corporation whose stock is publicly traded) in any business entity that engages in work within the scope of SFUA Article I hereinabove using employees whose wage package, hours, and working conditions are inferior to those prescribed in this Agreement, or if such business entity is located or operating in another area, inferior to those prescribed in the agreement of the sister local union affiliated with Sheet Metal Workers' International, AFL-CIO in that area.
 An Employer is also a 'bad-faith employer' when it is owned by another business entity as its direct subsidiary or as a subsidiary of any other subsidiary within the corporate structure thereof through a parent-subsidiary and/or holding-company relationship, and any other business entity within such corporate structure is engaging in work within the scope of SFUA Article I hereinabove using employees whose wage package, hours, and working conditions are inferior to those prescribed in this Agreement, or if such other business entity is located or operating in another area, inferior to those prescribed in the agreement of the sister local union affiliated with Sheet Metal Workers' International, AFL-CIO in that area.
 Section Two: Any Employer that signs this Agreement or is covered thereby by virtue of being a member of a multi-employer bargaining unit expressly represents to the Union that it is not a 'bad-faith employer' as such term is defined in Section 1 hereinabove and, further, agrees to advise the union promptly if at any time during the life of this Agreement said Employer changes its mode of operation and becomes a 'bad-faith employer.'
 Failure to give timely notice of being or becoming a 'bad-faith employer' shall be viewed as fraudulent conduct on the part of such Employer.
 In the event any Employer signatory to or bound by this Agreement shall be guilty of fraudulent conduct as defined above, such Employer shall be liable to the Union for liquidated damages at the rate of $500 per calendar day from the date of failure to notify the Union until the date on which the Employer gives notice to the Union. The claim for liquidated damages shall be processed as a grievance in accordance with, and within the time limits prescribed by, the provisions of SFUA Article X.
 Section Three: Whenever the Union becomes aware that an Employer has been or is a 'bad-faith employer,' it shall be entitled, notwithstanding any other provision of this Agreement, to demand that the Agreement between it and such 'bad-faith employer' be rescinded. A claim for recision shall be processed by the Union as a contract grievance in accordance with, and within the time limits prescribed under, the provisions of SFUA Article X of this Agreement.
 App. at 2788-90.
 
 
 [2]
 Earlier, on April 18, 1986, Local 17 declared its agreement with Limbach to be void and disclaimed interest in representing Limbach employees in Boston but it was subsequently forced to resume its relationship with Limbach pursuant to court order
 
 
 [3]
 The complaint also made RICO claims but the district court directed a verdict against Limbach on these claims, a ruling not in issue here. Edward J. Carlough was also a defendant but the action was dismissed as to him and he is not a party to this appeal. Local 80 has not been a party to this action, though Limbach did file an unfair labor practices charge against it with the National Labor Relations Board. See Gottfried v. Sheet Metal Workers' Local No. 80, 876 F.2d 1245, 1248 (6th Cir.1989)
 
 
 [4]
 Section 8(f) of the NLRA, 29 U.S.C. § 158(f), provides in part:
 [i]t shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged ... in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, ... [Emphasis added].
 
 
 [5]
 Of course, a union can also become the representative in the first instance through a National Labor Relations Board election or voluntary recognition under section 9(a), 29 U.S.C. § 159(a)
 
 
 [6]
 29 U.S.C. § 187 provides in part:
 (a) [i]t shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.
 
 
 [7]
 The issue of whether quitting can constitute refusal to work in the course of employment is an issue of statutory construction, subject to plenary review. Chrysler Credit Corp. v. First Nat'l Bank and Trust Co., 746 F.2d 200, 202 (3d Cir.1984)
 
 
 [8]
 Limbach does not argue, nor do we decide, whether the actions of the unions with respect to its own members in Limbach's employ would constitute an unfair labor practice under section 8(b)(4)(ii)
 
 
 [9]
 The focal point of the unions' argument involves the issue of the disclaimer of their section 8(f) agreements with Limbach. It is their position that they had the right to disclaim the agreements upon their natural expiration and that any illegal motive does not negate this right. As a direct consequence of this theory, the unions claim that the instructions given to the jury on the disclaimer issue were erroneous. Over the unions' objection, the court instructed the jury that a disclaimer of representation would be unlawful when undertaken for an objective prohibited by section 8(b)(4). Since the jury instruction issue is directly related to the substantive disclaimer issue itself, it is not discussed separately. Because we find that the disclaimer scheme could be the basis for a section 8(b)(4)(ii) violation, we determine that the instructions to the jury were not erroneous
 
 
 [10]
 The administrative law judge before whom the secondary boycott charge underlying Gottfried was tried concluded that a section 8(b)(4) violation was not established because Limbach and Harper are not separate employers, a decision on appeal to the Board. The unions sought to introduce this decision into evidence but the district court excluded it. This is an issue argued by the unions on appeal. See infra
 On remand, the district court again refused to issue the injunction. The court of appeals reversed the district court's denial of the injunction as an abuse of discretion based on its determination that the court erred in applying the two-pronged test for injunctive relief. Gottfried v. Sheet Metal Workers' Int'l Ass'n Local 80, 927 F.2d 926 (6th Cir.1991). As the appropriate injunctive relief, the court of appeals ordered that Limbach be treated as a party to the new agreement, pending outcome of the final adjudication of the case before the Board.
 
 
 [11]
 We are revisiting familiar ground in holding that an improper motive may make unlawful what is otherwise unassailable conduct. Thus, in Kenrich Petrochemicals, Inc. v. NLRB, 893 F.2d 1468 (3d Cir.), on rehearing, 907 F.2d 400 (3d Cir.) (in banc), cert. denied, --- U.S. ----, 111 S.Ct. 509, 112 L.Ed.2d 522 (1990), we held that while ordinarily a supervisor is not a protected employee within the Act, her discharge may be an unfair labor practice if it interferes with, restrains, or coerces protected employees in the exercise of their right to engage in protected activity
 
 
 [12]
 We note that, although during the term of a section 8(f) agreement neither the employer nor the union can unilaterally disclaim the agreement, section 8(f)'s final proviso specifically preserves the right of the employees to vote, pursuant to 29 U.S.C. § 159(e), to decertify or change their bargaining representative. Deklewa, 282 N.L.R.B. at 1387. The fact that the unions and/or employers are not free unilaterally to disclaim the agreement promotes stability in the construction industry. Id. at 1386. The fact that the employees remain free to vote to decertify the union promotes employee free choice. Id. at 1381, 1386. Similarly, and discussed infra, unions are prohibited under section 8(b)(7)(C) from using coercive recognitional picketing to obtain a section 8(f) agreement. This further protects employees' representational desires. Id. at 1381
 
 
 [13]
 While we are remanding the case for a new trial on the disclaimer issue, we do not imply that we are precluding Limbach from moving for partial summary judgment on the point. It may well be that the uncontested facts would establish that the unions committed an unfair labor practice as a matter of law, as it seems clear that the disclaimers were not intended to be permanent for Carlough explained at the 1986 convention that Limbach would be welcome back in the union family if Harper became a union shop. Limbach, understandably, does not press this point, as it is defending a verdict and therefore urges that "the evidence supports the jury's verdict that the unions violated section 8(b)(4)(ii)."
 
 
 [14]
 We review the charge to determine "whether the charge, taken as a whole and viewed in light of the evidence, fairly and adequately submits the issues in the case to the jury," and reverse "only if the instruction was capable of confusing and thereby misleading the jury." Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 922 (3d Cir.1986). When interpreting jury instructions, the reviewing court considers the totality of the instructions and not a particular sentence or paragraph in isolation. In re Braen, 900 F.2d 621, 626 (3d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991). Failure to instruct the jury as requested does not constitute error so long as the instruction, taken as a whole, properly apprises the jury of the issues and the applicable law. Gutzan v. Altair Airlines, Inc., 766 F.2d 135, 138 (3d Cir.1985)
 
 
 [15]
 The administrative law judge determined that the position taken by General Counsel, which is the same position taken by Limbach in this case, was based on the "erroneous assumption that Harper was the primary employer with whom the union had a labor dispute and Limbach was the secondary employer or neutral employer on whom the Respondents were putting pressure to force Harper to sign a union contract or Limbach Constructors, Inc. to divest itself of Harper." The administrative law judge found that the facts did not support the General Counsel's theory. The judge found that the Union's dispute was with Limbach Company and Walter Limbach, not Harper, since Walter Limbach had resolved that Limbach would operate union and Harper nonunion. The judge determined as a factual matter that Walter Limbach established Jovis in order to effect a double-breasted operation; that Limbach had the decision making power to decide if Harper would be union or nonunion and decided that Harper would be nonunion. As further proof that the Union's dispute was with Limbach Company, the judge relied on the fact that, when Limbach would not have Harper sign a bargaining agreement with the union, the union filed grievances against Limbach, in which the NJAB found that the acquisition of Harper violated the agreement between Limbach and Local 17. We believe the better characterization is not that Limbach decided that Harper would be nonunion, but sought out nonunion operations
 
 
 [16]
 At the same time, the district court granted Locals 12 and 17 leave to amend their answers to requests for admissions in which they originally admitted that Limbach and Harper are separate persons within the meaning of the Act. The district court also denied Limbach's motion that the International, Local 98 and Local 108 be deemed to have admitted that Limbach and Harper are separate persons within the meaning of the Act for having filed insufficient or no answer to Limbach's request for admissions
 
 
 [17]
 We also point out that the court in Gottfried v. Sheet Metal Workers' Local No. 80, indicated that "Limbach and Harper are separate 'persons' within the meaning of the secondary boycott provisions of the [NLRA]." 876 F.2d at 1247. It seems obvious that different persons can view this issue in different ways and in the absence of a preclusive holding it was surely not error to exclude one of these views
 
 
 [18]
 We find instruction as to the approach to take in this matter in Eichleay Corporation v. International Ass'n of Bridge, Structural and Ornamental Iron Workers, 944 F.2d 1047 (3d Cir.1991). In Eichleay we entertained an appeal by certain unions from an order of the district court vacating arbitration awards favorable to the unions in a grievance against Eichleay Corporation. The grievance asserted that Eichleay violated the collective bargaining agreements by establishing an alter ego nonunion corporation and by directing work to it which should have been performed by union employees. Thus, the unions in Eichleay prevailed in arbitration on a claim somewhat like that on which the unions in this case were unsuccessful in the arbitration before the NJAB. In Eichleay we reversed the district court and ordered that the arbitration award on this point be confirmed. In our opinion we pointed out that "elements necessary for a finding of alter ego status are substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership between the two corporations" and thus an inquiry into whether there was an alter ego situation "is essentially the same as that used for a finding of single employer status." We then stated that in "determining single employer status, four elements are considered: interrelationship of operations, common management, centralized control of labor relations, and common ownership." At 1059. In Eichleay, unlike here, it appears that very little effort was made to keep the corporations separate for as we pointed out in Eichleay:
 In this case, there was ample evidence from which the arbitration panel could conclude that ECI and Eichleay were alter egos. ECI and Eichleay were both wholly owned subsidiaries of Eichleay Holdings, Inc. There was evidence that ECI and Eichleay shared office space and clerical staff. High ranking corporate officers were transferred between Eichleay and ECI.
 The companies shared common services for estimating, sales, accounting, data processing, check writing, invoice processing and payment, and computer services. Eichleay set up and guaranteed a line of credit for ECI, and loaned ECI cash without a written agreement or set date for repayment. Eichleay guaranteed ECI's portion of the Pitcal job. There was evidence that ECI and Eichleay were both controlled by Geoff Eichleay, and that Geoff Eichleay made the major decisions for both companies, including the decision that Eichleay should drop out and ECI should bid on the Pitcal job.
 At 1059.
 Furthermore, Eichleay differs from this case for the fundamental reason that Harper had been a nonunion enterprise long before its purchase whereas in Eichleay the nonunion operation was newly created.
 The significance of Eichleay for us is its emphasis on our appropriate scope of review. As we pointed out in Eichleay, a court's view of an arbitration award is "extremely deferential" and thus an award must be confirmed unless it is "irrational". At 1059. That test is not exactly the same as that we use in reviewing the orders denying a directed verdict and a judgment notwithstanding the verdict but is similar. Thus, just as the arbitration award in Eichleay could not be vacated neither can the verdict on the separate employer issue in this case.
 We followed the same deferential approach in NLRB v. Omnitest Inspection Services, Inc., 937 F.2d 112 (3d Cir.1991), a matter involving an application by the National Labor Relations Board for enforcement of an order which depended upon a successor corporation being an "alter ego" of its predecessor. We enforced the order, holding that "[t]he determination that an alter ego exists is a question of fact for the Board, which we must uphold if, upon review of the entire record, it is supported by substantial evidence." At 121.
 
 
 [19]
 Apparently the parties considered that proof of some damage was appropriate at the liability trial, even though the case was bifurcated, because without damage there can be no liability. We, however, do not suggest that a case cannot be absolutely bifurcated so that all damage questions are left to the second phase, a procedure which can result in a judgment being entered in favor of a defendant earlier found liable by the jury
 
 
 [20]
 15 U.S.C. § 15 provides:
 any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 
 
 [21]
 This court's review of the grant of a directed verdict is plenary. A directed verdict should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law. Macleary v. Hines, 817 F.2d at 1083. We must utilize the same standard used by the district court. Flynn v. Bass Bros. Enterprises, Inc., 744 F.2d 978, 983 (3d Cir.1984)
 
 
 [22]
 Because we determine that the district court properly granted the unions' directed verdict motion on the basis that there was insufficient evidence of a conspiracy to submit the antitrust claim to the jury, we do not consider whether the directed verdict could also have been based on the labor exemption to the anti-trust laws
 
 
 [23]
 It is possible that the verdict on damages already returned is distinct from the liability verdict and thus damages need not be retried. But we cannot be sure of that point for the parties have not briefed the possibility of salvaging the damage verdict. Thus, we will leave the issue to the district court in the first instance. If it appears that the amount of damages was exactly the same for each of the two bases for secondary boycott liability submitted to the jury, and if it further appears that the jury could not have enhanced its award of damages by reason of the circumstance that there were two bases for liability as opposed to one, the district court might, in accordance with Childers v. Joseph, 842 F.2d at 699, conclude that a damages retrial is not needed. Of course, if on remand there is no liability, there can be no damages